**Frank SIMONS and Connie Simons, doing business as Frank Simons Dairy, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 317–88 C.**

United States Claims Court.

March 23, 1992.

Robert A. Mangrum, Washington, D.C., for plaintiffs.

Donald E. Kinner, with whom were Stuart E. Schiffer and David M. Cohen, Washington, D.C., for defendant. Terrence G. Jackson, Dept. of Agriculture, of counsel.

## OPINION AND ORDER

TURNER, Judge.

This case involves a contract for the termination of milk production entered into between plaintiffs, Frank and Connie Simons, and Commodity Credit Corporation (CCC), an agency of the Department of Agriculture (USDA), pursuant to the Dairy Termination Program, one of a series of milk price support programs. *See* 7 U.S.C. § 1446(d)(3)(A)(i); 7 C.F.R. §§ 1430.450–.470. Plaintiffs allege that they fully performed under the terms and conditions of the contract by slaughtering their entire herd of dairy cattle and that the government breached the contract by failing to pay plaintiffs for the disposal of their herd as required by the contract. They seek judgment for $274,994.22 as full payment of amounts due under the contract.[1]

---

1. The parties agreed that the contract price would be paid in five installments. The first installment, representing 80% of the contract price or $219,995.38, was due within 30 days of the herd disposal completion date (August 31, 1986). The four remaining installments of $13,-749.71 each were to be paid within 30 days of each of the next four anniversaries of that date. R. 255, 267.

Although the plaintiffs assert contract rights arising from an express contract with a federal agency, the case is actually one for judicial review of final agency action adversely affecting plaintiffs rather than a de novo proceeding for breach of an express contract. *See Doty v. United States*, 24 Cl.Ct. 615, 623–27 (Part II) (1991). Consequently, both the scope and standard of review are those applicable to review of an administrative proceeding. *Id.* Plaintiffs have exhausted their administrative remedies and appeal from the final decision made by the Deputy Administrator for State and County Operations (DASCO) of the Agricultural Stabilization and Conservation Service (ASCS).[2]

DASCO determined that plaintiff Frank Simons (hereafter, "Simons" and "plaintiff" refer solely to Frank Simons)[3] was not entitled to receive payment because he had violated the DTP contract by failing to accurately report his dairy herd composition on the bid date, by failing to brand all dairy cattle by the branding deadline, and by violating the non-production period restriction. In addition to denying payment of amounts due under the contract, DASCO imposed penalties of $304,200 for those violations. Defendant contends that DAS-CO's decision finding plaintiff ineligible to receive contract payments and liable for penalties has a rational basis in the administrative record and should be upheld. Defendant also seeks judgment on a counterclaim for $304,200, the amount of the penalties assessed.

The case currently stands on defendant's motion for summary judgment.[4] Plaintiff contends that the defendant's motion should be denied because there are genuine issues of material fact which preclude summary disposition. For reasons set forth below, we conclude that defendant's motion should be granted in part and that ruling on the remainder should be withheld pending completion of administrative proceedings on remand. We further conclude that the matter should be remanded to DASCO for further proceedings consistent with this opinion.

I

The source of the following factual narrative is the administrative record filed with the court (R. 1–286).[5] The narrative is intended to provide the context in which

---

2. The DTP is administered under the general supervision of the Administrator of the ASCS, an agency within the USDA. The program is carried out in the field by ASCS state and county committees. 7 C.F.R. § 1430.451; *Stegall v. United States*, 19 Cl.Ct. 765, 768–69 n. 2 (1990). Program participants enter into DTP contracts with the Commodity Credit Corporation (CCC) which is also an agency within the USDA. 7 U.S.C. § 1446(d)(7). The CCC handles the funding of many farm subsidy programs including the DTP, 15 U.S.C. § 714, while the ASCS is responsible for administering these programs on a daily basis, 7 C.F.R. § 1430.451. *See Doty v. United States*, 24 Cl.Ct. 615, 616 n. 2 (1991); *Stegall*, 19 Cl.Ct. at 768–69 n. 2.

3. Both Frank and Connie Simons, husband and wife, were designated as plaintiffs in the complaint, and both signed the bid form which became the DTP contract in suit (R. 270). However, on the bid form (CCC–312), the Frank Simons "share" of potential proceeds is designated as 100% and the Connie Simons "share" is stated to be 0%. *Id.* Further, the entire administrative record reflects an ASCS assumption that Frank Simons was the sole participant (see especially ASCS determinations at R. 15, 216, 233, 235, 263). Although, in this opinion, we assume that both are proper parties to this suit, this apparent discrepancy should be resolved before entry of judgment with respect to the complaint filed May 26, 1988 and/or the government's counterclaim filed September 23, 1988.

Because the administrative record generally refers to Frank Simons as if he were the sole participant and because it is otherwise convenient, this opinion generally refers to a single plaintiff, Frank Simons, as if he were the only party plaintiff.

4. Plaintiffs filed a motion for partial summary judgment on August 2, 1989, and defendant filed a cross-motion for summary judgment on August 31, 1989. On June 18, 1991, plaintiffs sought leave to withdraw their motion for partial summary judgment; leave was granted by order dated June 20, 1991. Consequently, the case now stands solely on defendant's motion for summary judgment.

5. "R." is used throughout the opinion to refer to the administrative record supplied by the defendant as a two-volume appendix to its (cross) motion for summary judgment filed on August 31, 1989.

this case arose and in no way represents independent findings of fact by the court.

## A. BACKGROUND

Plaintiff owned and operated the Frank Simons Dairy in Orland, California for approximately eighteen years. During the latter part of this period, he was assisted in his dairy operations by his son Vincent. In November 1985, Vincent Simons was 21 years old and owned his own herd of dairy cattle registered in his name consisting of approximately twenty Holstein cows and fifty-seven Holstein heifers.[6] Vincent Simons' cattle were marked with yellow ear tags and the cattle belonging to his father were marked with green ear tags.

In order to reduce the quantity of milk marketed for commercial use, Congress implemented the Dairy Termination Program for an eighteen-month period beginning April 1, 1986. 7 U.S.C. § 1446(d)(3)(A)(i); 7 C.F.R. §§ 1430.450–.470.[7] When the details of the DTP were announced in the fall of 1985, plaintiff advised his son that he was interested in participating and withdrawing from the dairy business. At this time, Vincent Simons expressed an interest in starting his own dairy. He did not want to participate with his parents in the DTP, and decided to move his heifers off his parents' property so that there would be no doubt that they were not part of his parents' dairy herd. On November 26, 1985, Vincent Simons moved his heifers onto a pasture leased from a neighbor, Jack Hayes. He left behind his twenty milk cows because they had contributed to his parents' milk base and had to be included in the DTP bid. Vincent Simons died intestate on February 28, 1986 as the result of an automobile accident. His parents declined to inherit his heifers (because of DTP restrictions explained below) and ownership of them passed to Veronica and Vivian Simons, Vincent's adult sisters.

On March 8, 1986, plaintiff submitted a bid to participate in the DTP which was accepted on March 31, 1986 by an ASCS county official for Glenn County, California (R. 270). The composition of the Simons' dairy herd as stated in the contract was 101 cows, 14 heifers, and 9 calves for a total of 124 dairy cattle. According to the contract terms, plaintiff agreed to dispose of his entire dairy herd[8] and to cease dairy operations for five years in exchange for a total payment of $274,994.22 (based on a bid of $19.78 per hundredweight for a milk production base of 1,390,264 pounds). R. 270. (Generally, a DTP participant is required to sell his dairy herd for slaughter or export and is entitled to the money from the sale in addition to payment under the contract by the CCC.) The Glenn County ASCS Executive Director Chris Lauppe notified Simons of his acceptance into the program on April 4, 1986 and advised him that all dairy cattle had to be branded within fifteen days. This branding deadline was later extended to May 6, 1986 (R. 266).

After Simons' bid was accepted, he realized that he would have extra feed remaining following the disposition of his dairy herd. In order to make use of this feed, in May 1986 Simons encouraged his two daughters, Veronica and Vivian, to form a partnership for the purpose of conducting a stocker operation[9] under the name of Double V. Vincent Simons' heifers, which had been inherited by his sisters, were included

---

**6.** In the administrative record, there are several versions of the number of cows and heifers owned by Vincent Simons. For purposes of this opinion, we rely on the report made by the USDA Inspector General's office to the effect that Vincent owned 20 cows (R. 247–48) and the determination of the ASCS county committee that he owned 57 heifers (R. 261–64).

**7.** Prior to the DTP, Congress attempted to reduce the milk surplus by means of the Milk Diversion Program (MDP). Under this program, farmers were paid to reduce milk production during the period from January 1, 1984

through March 31, 1985. *See Parks v. United States*, 15 Cl.Ct. 183 (1988).

**8.** Plaintiff was required to dispose of the herd between April 1, 1986 and August 31, 1986 (R. 270).

**9.** A stocker operation purchases young weaned cattle, puts them on feed for a few months to gain weight (approximately 200 pounds in a season) and sells them at auction to other farmers who carry the young cattle into the later phases of meat production.

in the stocker operation. Simons made the initial capital contribution to start the Double V operation as a gift to his daughters. He also acted as a cattle-buying agent but was not a partner and did not stand to share in profits or losses of the Double V operation. R. 20–30.

In early May 1986, County Executive Director Lauppe received several phone calls, some anonymous, accusing Simons of DTP infractions including illegal transfer of DTP animals to his daughters through a newly-created entity called "Double V Dairy," purchasing dairy animals under the name of "Double V Dairy," not following branding requirements, and not including all dairy animals in his dairy herd composition as of the bid date. Lauppe and a member of the Glenn County ASCS committee, George Bailey, visited the Simons dairy on May 7, 1986 to investigate these accusations.

During their visit, Lauppe and Bailey conducted a spot check. They found 79 cows, 14 heifers and 11 calves on plaintiff's property for a total of 104 dairy cattle. (The bid listed 124 dairy cattle in the herd.) Of the cattle found, 79 were unbranded (57 cows, 13 heifers, 9 calves) and the branding deadline had expired the day before (on May 6, 1986). The spot check also revealed 57 unbranded heifers on the neighboring pasture of Jack Hayes, some with yellow ear tags and some with green ear tags. On another neighboring pasture, George Joslin's, there were two branded cows and six unbranded heifers. Simons admitted that the two cows and six heifers should have been but were not included in his herd count on the bid date. He also explained that the 57 unbranded heifers on the Hayes' pasture had belonged to his son but now belonged to his two daughters.

Simons was asked to appear before the Glenn County ASCS committee to discuss these problems and rumors concerning his contract. At a meeting on May 19, 1986, Simons said that he had been aware of the May 6 branding deadline. Simons also said that he did not actually take a head count on the bid date (the bid reflected an estimate) and that when he counted the herd later, he found he had two cows and six heifers in excess of his bid. The county committee meeting minutes reflect that prior to submitting his bid, Simons had been keeping some dairy cattle on the property of a neighbor, George Joslin, and that Simons moved back to his unit only enough of these animals to fill out the numbers reported on the bid date, leaving two cows and six heifers on George Joslin's pasture (R. 264). The minutes reflect that Simons indicated that he might have tried "to beat" the program by selling the six heifers and two cows he omitted from his bid and which were found on Joslin's pasture (R. 264).[10]

After hearing from Simons, the ASCS county committee made the following determinations: (1) Simons failed to brand all cattle by the May 6 deadline with no reasonable excuse for noncompliance; (2) Simons incorrectly reported the herd count on the bid date but not with the intent of evading the program provisions (the committee felt plaintiff had been in a poor mental state following the untimely death of his son); (3) Simons was unable to present convincing evidence of ownership

10. In numerous respects, the minutes of the May 19, 1986 meeting (R. 263–65) reflect inconsistencies with other parts of the administrative record. For example, according to the minutes Simons stated (1) that his son had owned nine cows which were included in the bid and that his son had owned approximately 40 heifers prior to his death and (2) that he and his son had an oral agreement that the son would assume ownership of 10 heifers belonging to Simons if the DTP contract were accepted. The committee meeting minutes indicate that there were no actual ownership records for the son's heifers (R. 264) although plaintiff contends that the heifers were registered in Vincent Simons' name. OIG saw registration certificates. The record indicates that Simons provided copies of his son's cattle registration and birth records to the Inspector General during a later investigation (R. 248). Review of these Holstein certificates of Registry by the Inspector General showed that Vincent Simons owned 37 Holstein dairy cows, and records of birth showed 43 calves being born between 1975 and 1984 (R. 248). Also, numerous declarations from persons with knowledge which were submitted by Simons to DASCO indicate that the son owned his own heifers and cows (R. 192, 193, 200, 202, 203, 212, 215).

of the heifers claimed to be owned by the son prior to his death. Because of the complexity of the possible violations, the committee requested a review by the USDA's Office of Inspector General. R. 265.

## B. OFFICE OF INSPECTOR GENERAL INVESTIGATIVE REPORT AND PENALTY ASSESSMENT

In September 1986, the USDA's Office of Inspector General (OIG) began an investigation of Simons for possible civil and criminal violations of the DTP (R. 246–52). The investigator, Special Agent Rondal Wix, found no dairy cattle on Simons' property because they had all been sold for slaughter. Wix counted 62 heifers on Jack Hayes' pasture and 20 heifers on George Joslin's pasture. Simons advised Wix that these heifers belonged to his daughters' Double V stocker operation.

On October 9, 1986, Simons signed a Reconciliation of Dairy Cattle Disposal Numbers (ASCS Form 315) completed by Lauppe which reflected that he had disposed of 105 cows, 24 heifers, and 6 calves pursuant to his contract for a total of 135 dairy cattle (R. 162). The number of cattle disposed of (135) is greater than the number listed in the bid (124). The larger number presumably includes the eight animals (two cows and six heifers) which should have been but were not included in Simons' DTP bid. Further, some discrepancy between bid and disposal numbers results from natural change in herd size, maturation of calves and heifers and innocent miscounts. Simons also completed a DTP application for payment (ASCS Form 309) requesting the initial contract payment of $219,995.38 (R. 164). Lauppe notified plaintiff on October 30, 1986 that he would

not be paid before the OIG issued a report of its investigation.

The OIG released its report of investigation on January 2, 1987 (R. 246–52). The report concluded that Simons had improperly failed to report portions of his son's dairy herd on his DTP bid, that Simons failed to brand his cattle according to DTP requirements and that Simons violated DTP regulations by acquiring an interest in additional dairy cattle after he had disposed of his herd (R. 246). The report is divided into two sections. The first section, entitled "False Statements—Title 15 U.S.C. § 714m(a)," indicates that Simons committed a criminal violation by making a knowing false statement on his bid about the composition of his dairy herd.[11] The second section, entitled "Dairy Termination Program Violations," contains allegations concerning Simons' failure to brand and his violation of the nonproduction period.

On January 14, 1987, Kenneth E. Frick, State Executive Director of the California State ASCS office, requested assistance from the Director for the Southwest Area of ASCS with regard to determining how penalties should be assessed against Simons based on the OIG report of investigation (R. 244).[12] Thomas Van Garlen, Acting Deputy Administrator of State and County Operations (DASCO) in Washington, D.C., responded to Frick's request on March 10, 1987. On the basis of the OIG report, case file and other documentation connected with the case, DASCO determined that the following actions should be taken (R. 238):

1. Redefine the unit to include all cattle and land used to produce milk or maintain dairy cattle that were used by both Simons and his son.

---

11. DASCO imposed civil, not criminal, penalties in this case. The United States Attorney's Office for the Eastern District of California declined prosecution in favor of administrative penalties (R. 245).

12. In conjunction with this request, a written narrative dated February 23, 1987 was prepared by ASCS District Director John Smythe for review by the Washington office (R. 240–42). It stated that the Glenn County ASCS Committee

had changed its position and now believed that Simons did not make a good faith effort to comply with the DTP program or his contract at any time during the process. It further stated that the Glenn County ASCS Committee now recommended that the DTP contract with Simons be terminated for misrepresenting facts which had the effect of defeating the purposes of the program and that Simons not be eligible for any payment under the contract. R. 242.

2. Determine, to the best of your knowledge, the dairy herd composition that should have been reported had the unit been defined correctly.

3. After the review process:

A. Assess a $5,000 civil penalty per head of dairy cattle not included by the producer in the herd composition.

B. Assess branding penalties ... on all cattle that should have been included on CCC–312 [bid form] that were found to be unbranded during the spot check completed on May 7, 1986.

C. Require that all cattle that should have been reported in the herd composition and all cattle purchased be slaughtered immediately.

D. Inform the producer that he is ineligible for payments under DTP.

E. Inform the producer that he is liable for a marketing penalty on all milk produced in which he has an interest during the five-year nonproduction period.

F. Inform the producer of his appeal rights.

Frick sent DASCO's March 10, 1987 determination to the Glenn County ASCS office and ordered it to take the action directed by DASCO. On March 18, 1987, Donald Perez (Lauppe's successor as Glen County ASCS Executive Director) wrote to Simons stating that the following had been determined:

1. A violation of the DTP contract occurred by not accurately reporting the dairy herd composition at the time of submitting your bid. This results in a civil penalty assessment of $5000 times the number of animals not included in the herd composition.

$5000 × 58 head = $290,000

2. Branding of all cattle that should have been included on the [form] CCC–312, Contract to participate, was not completed by the branding deadline and results in a penalty of $100 × 142 head = 14,200. This is computed by multiplying

the number of head unbranded times $100 per head.

Total Penalties: $290,000 for inaccurate report of herd composition

$ 14,200 for not meeting branding requirements

$304,200 total penalties
...

3. You are further required to slaughter all cattle that should have been included in the original herd composition and all dairy cattle purchased by you or Double V.

4. You will be liable for a marketing penalty on all milk produced in which you have any interest during the five year non-production period....

5. Due to the violations of your Dairy Termination Program Contract, you will be ineligible for any program payments under the DTP Program.

R. 235. (This was the first official notice of adverse determinations given to plaintiff.) The letter also notified Simons that he could appeal the decision in writing to the Glenn County ASCS committee within 15 days. Perez then scheduled Simons' appeal hearing for the next day, March 19, 1987.

### C. ADMINISTRATIVE APPEAL PROCESS

Simons appeared at the appeal hearing before the Glenn County ASCS Committee.[13] He claimed that the 58 heifers in question (57 according to the original spot check by county officials on May 7, 1986, R. 261, 263) were not included in his bid-date herd composition because they did not belong to him. He stated that the heifers belonged to his son until his son's accidental death on February 28, 1986 and thereafter ownership was transferred to his two daughters. Simons also took the position that the heifers were on pasture land rented to his son and then to his daughters which should not have been included in his unit. Simons did not dispute the allegation

---

[13]. ASCS county committees are composed of three local farmers who are elected by other farmers in the county. They hear appeals from ASCS determinations in order to give a local farmer the opportunity to have the determination reviewed by his peers who are knowledgeable about farming and local conditions. 16 U.S.C. § 590h(b).

that he failed to brand all dairy cattle by the May 6 deadline but he disputed the numbers involved. He claimed that the branding penalty should not apply to heifers owned by his son or to heifers subsequently purchased by Double V.

The county committee denied Simons' appeal on March 20, 1987 and informed him that he could appeal to the state committee within fifteen days. The county committee was of the opinion that Vincent Simons should have been included on the DTP contract since his cows were part of the herd that contributed to milk production of the Simons Dairy. They felt, therefore, that all the dairy cattle (including cows and heifers) owned by Vincent Simons should have been included in the herd count. The committee also felt that the pasture land leased from George Joslin and Jack Hayes should have been included in Simons' dairy unit and thus all the heifers on those pastures would have to be included also. It relied on the OIG investigative report which indicated that the pastures were leased to Simons and not to his son. R. 232. Although it denied the appeal, the county committee felt that the fines imposed were exceedingly severe. They recommended either that Simons be allowed to continue his participation in the program and that realistic fines be assessed, or that no fines be assessed and he be ineligible to receive DTP program payments. R. 226.

Simons appealed the county committee's decision to the state ASCS committee. He advised that he was unable to appear personally at the next meeting of the state committee but sent a handwritten letter explaining that his son's heifers were not part of his dairy unit and that there was no such thing as Double V "Dairy." R. 227–28. State Executive Director Frick advised Simons by letter dated April 10, 1987 that his appeal had been denied by the state committee. Frick's letter identified the following three major violations as determined by the OIG investigation: (1) failure to brand dairy cattle; (2) violation of nonproduction period; and (3) false statement

of dairy herd composition. The letter also stated: "The decision to assess these penalties was made by the Washington ASCS office based on the information contained in the investigation report. The California State ASCS Committee has no authority to overrule this directive. Based on this fact the state committee had no alternative but to deny your appeal." [14] R. 216. Simons was also advised that he could appeal within 15 days to the ASCS Deputy Administrator, State and County Operations (DASCO) in Washington, D.C. (Subsequently, the state committee advised the ASCS director of the Southwest Area that "the penalties assessed are too high" and recommended substantially lesser penalties even assuming the correctness of the violations found (R. 207).)

Simons appealed the decision of the state committee to DASCO by letter dated April 18, 1987 (R. 212). In the letter he identified several inaccuracies in the OIG report, a copy of which he had received for the first time on April 10, 1987. By this time, Simons had retained an attorney who requested that DASCO remand the matter to the state committee for reconsideration so that Simons could provide additional evidence to rebut the OIG report (R. 208–09). DASCO denied the request for remand on June 19, 1987 (R. 205). Simons' attorney requested a hearing by personal appearance before DASCO which was held in Washington, D.C. on September 17, 1987. In conjunction with his appeal, Simons submitted to DASCO several sworn declarations by people familiar with the facts, many of whom had been questioned by Special Agent Wix (R. 192–203). These declarations contain statements directly contradicting Wix's findings as reported in his investigative report. They are now part of the administrative record.

After the DASCO hearing and before a decision was rendered, Simons' attorney provided DASCO with additional information including a copy of the 1986 tax return filed by Double V; the declaration of Bruce

---

14. After denying the appeal, the California State ASCS committee advised DASCO that the penalties assessed were excessive. It recommended that DASCO terminate the contract and assess a penalty of $50 per head for not complying with the branding deadline. R. 221, 207.

Hubbell, the accountant for both Double V and plaintiffs; a declaration of Vivian Simons; a bank signature card for Double V signed by Vivian Simons and plaintiff; and Double V check number 140 signed by Veronica (Simons) Gomes as payment of pasture rent for the period March 1—October 30, 1986 (R. 18–35).

DASCO denied the appeal by letter dated October 2, 1987 (R. 15–16). In support of its decision, the Deputy Administrator, Earle J. Bedenbaugh, stated:

> Your client freely admitted he did not provide an accurate head count regarding his herd's composition. That fact alone is enough to deny all DTP benefits. We also could not find sufficient evidence to support your client's claim that animals were sold to his son and the heifers on the rented pasture land were owned by the same. Additionally, all checks written for or against the Double V Dairy account have been written by your client. We have determined that the county and state committee acted properly within their delegated authority regarding this matter. All penalties assessed your client shall stand. However, your client may earn the DTP payment if cattle on the rental unit, known as Double V Dairy, are disposed of according to DTP regulations. This determination is based on the fact that your client has provided substantial compliance. The penalties shall be setoff from any benefits your client may earn.

R. 16. Simons' request for reconsideration of DASCO's decision (R. 6–12) was denied on November 24, 1987 (R. 5). Simons' second request for reconsideration was likewise denied by DASCO on March 18, 1988 (R. 2). Simons, who by this time was in bankruptcy, filed a complaint in the Claims Court on May 26, 1988 alleging breach of contract by the government for its failure to pay pursuant to the DTP contract.

## II

### A. JURISDICTION

Neither party contests the court's jurisdiction to address plaintiff's complaint (seeking judgment for the contract price) or the government's counterclaim (seeking judgment for penalties assessed by ASCS).[15] Clearly, the court has jurisdiction over plaintiff's claim, 28 U.S.C. § 1491(a)(1) & (2); 15 U.S.C. § 714b(c), and over defendant's counterclaim, 28 U.S.C. § 1503 ("Claims Court shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court"); *see Parks v. United States*, 15 Cl.Ct. 183, 188–89 (1988).[16] *See generally Doty v. United States*, 24 Cl.Ct. 615, 623 (Part II A) (1991).

These general jurisdictional provisions control unless a specific statute, such as the one establishing the Dairy Termination Program, contains a jurisdictional provision indicating otherwise. *United States v. Erika, Inc.*, 456 U.S. 201, 208–09, 102 S.Ct.

---

**15.** By order dated August 9, 1989, count two of the complaint, seeking declaratory judgment that plaintiffs were not liable for the ASCS $ 304,200 penalty assessment, was dismissed for lack of subject-matter jurisdiction. As a practical matter, the liability issues pertaining to defendant's counterclaim are identical to those presented by count two of the complaint (plaintiffs' liability for assessed penalties). Thus, as a result of defendant's counterclaim, the court has jurisdiction to address all liability and damages issues raised by both parties. *See* 28 U.S.C. § 2508 (when government asserts counterclaim, "the court shall hear and determine such claim or demand both for and against the United States and plaintiff").

**16.** Title 28 U.S.C. § 1503 establishes jurisdiction over a counterclaim by the government even though a statute specifically grants jurisdiction

over the subject matter of the counterclaim to the district courts. *Brown v. United States*, 207 Ct.Cl. 768, 784–87, 524 F.2d 693, 703–04 (1975); *Erie Basin Metal Prods., Inc. v. United States*, 123 Ct.Cl. 433, 107 F.Supp. 588 (1952). The Supreme Court, in *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946), explicated the purpose of the Claims Court's counterclaim jurisdiction:

> [T]o permit the Government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the Government and a claimant against it. Legislation of this kind has long been favored and encouraged because of a belief that it accomplishes among other things such useful purposes as avoidance of "circuity of action, inconvenience, expense, consumption of the courts' time, and injustice."

1650, 1654–55, 72 L.Ed.2d 12 (1982); *Parks*, 15 Cl.Ct. at 188. The Dairy Termination Program statute provides for district court jurisdiction to enforce DTP statutes and regulations and to hear appeals of DTP penalties, 7 U.S.C. § 1446(d)(5)(A), (C) & (D). However, the statute further provides that remedies available in the district courts "shall be in addition to, and not exclusive of, other remedies that may be available." 7 U.S.C. § 1446(d)(5)(E). Thus, there is no jurisdictional impediment to consideration of any issue in the case.

## B. SCOPE AND STANDARD OF REVIEW

As stated above, this case is one for judicial review of final agency action adversely affecting plaintiff rather than a de novo proceeding for breach of an express contract. Consequently, both the scope and standard of review are those applicable to review of administrative proceedings. *See generally Doty v. United States*, 24 Cl.Ct. 615, 624–27 (Part II B) (1991).

The scope of review is limited to the administrative record developed by the ASCS (R. 1–286). *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially by the reviewing court"). There are exceptions to this principle but none is relevant in this case.[17]

Restriction to the administrative record is a correlative of the standard of judicial review applicable to appeals from administrative agency action. The proper standard of review is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This standard ordinarily restricts the court's review to the administrative record. *Camp v. Pitts*, 411 U.S. at 142, 93 S.Ct. at 1244. Further, when agency action is "reviewed on the record of an agency hearing provided by statute," the standard of review includes whether the action is supported by substantial evidence in the administrative record. 5 U.S.C. § 706(2)(E).[18]

17. There are circumstances appropriate for a trial court to permit supplementation of an administrative record. In *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989), the court found that "exceptions to the general rule have been recognized" under the following circumstances: (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

The court concluded in that case, *Esch*, 876 F.2d at 993: "Only by examining the underlying facts, which [the agency] never gathered in a coherent record, could the [trial] court determine whether appellees got their procedural just due."

The Court of Appeals for the District of Columbia also permitted supplementation of the administrative record by the trial court in *Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287 (D.C.Cir.1975) (litigants challenging an

agency decision presented affidavit making a substantial showing that the agency had not filed the entire administrative record with the court).

None of these exceptions applies in the instant case, and our review is confined to the administrative record.

18. Ordinarily, an administrator's determination would be reviewed by the Claims Court under the standards articulated in the Administrative Procedure Act, 5 U.S.C. § 706. *See Pender Peanut Corp. v. United States*, 20 Cl.Ct. 447, 451–52 & n. 3 (1990); *Stegall v. United States*, 19 Cl.Ct. 765, 769–70 (1990); *Parks v. United States*, 15 Cl.Ct. 183, 189–90 (1988). *But see Town of Fallsburg v. United States*, 22 Cl.Ct. 633, 641–42 n. 6 (1991). The APA, 5 U.S.C. § 706, provides these standards for judicial review of administrative action:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

The fundamental issue in this case is whether DASCO's October 2, 1987 determination, finding plaintiff ineligible for payment pursuant to its DTP contract and liable for penalties, was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law based on the administrative record. *But see* Part II C & D.

When reviewing agency action, the Administrative Procedure Act requires a "thorough, probing, in-depth review" of the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 706(2)(A). The court is not empowered to substitute its judgment for that of the agency, and the agency construction need not be the only reasonable one or the one that a court would have reached. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). Rather, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions.' " *Nabisco, Inc. v. United States,* 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979) (quoting *Port Authority of St. Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970)).

DASCO's decision that plaintiff was not entitled to DTP contract payments and to impose penalties is entitled to substantial deference. *Rogers v. United States,* 14 Cl.Ct. 39, 46 (1987), *aff'd,* 861 F.2d 729 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1930, 104 L.Ed.2d 403 (1989). Indeed, the court must presume that DASCO acted correctly and with regularity. *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. The court's review of agency action, however, includes an inquiry into both the rationality of the decision based on the evidence cited to support it and an inquiry into the procedural context to see if there was procedural error. *Hedman v. United States,* 21 Cl.Ct. 385 (1990). Assertions of procedural error at the agency level would be reviewed under the harmless error standard. *Sterlingwear of Boston, Inc. v. United States,* 11 Cl.Ct. 879, 889 (1987). Thus, the agency action in question need only be in substantial compliance with applicable regulations and a litigant must show demonstrable prejudice in support of its claim of procedural error. *Laningham v. United States,* 2 Cl.Ct. 535, 556 (1983).

## C. RESTRICTED SCOPE OF REVIEW

Notwithstanding the foregoing, agency action is not reviewable when "statutes preclude judicial review" or when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1) & (2); *Stegall v. United States,* 19 Cl.Ct. 765, 769–70 (1990). *See Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985) ("The standards to be applied on review are governed by the provisions of § 706. But before any review at all may be had, a party must first clear the hurdle of § 701(a)."). Congress significantly narrowed the scope of judicial review concerning most agricultural price support programs by the enactment of 7 U.S.C. §§ 1385 and 1429. As a result, judicial review of final ASCS action concerning DTP contracts is much more restricted than most other review of agency action under the standards set forth in 5 U.S.C. § 706. To resolve the instant case, we must explore the details of this restriction.

Title 7 U.S.C. § 1385 provides:

> parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. DTP contract claims like the one in this case constitute appeals from final agency action subject to judicial review, but such review is not as broad as that described in 5 U.S.C. § 706. *See* Part II C & D.

....
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute ...
....
In making the foregoing determinations, the court shall review the whole record or those

[T]he *facts constituting the basis* for ... any ... price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, *shall be final and conclusive and shall not be reviewable* by any other officer or agency of the Government.

(Emphasis added.) Further, 7 U.S.C. § 1429 provides:

*Determinations made by the Secretary* under [the Agricultural Act of 1949] *shall be final and conclusive: Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act [15 U.S.C. § 714 *et seq.* ].

(Emphasis added.) Both of these statutes apply to DTP contracts under 7 U.S.C. § 1446(d).

Sections 1385 and 1429 are potentially pivotal since, taken literally and in combination, they would preclude *all* judicial review of any kind pertaining to both factual findings and determinations in agricultural price support programs (assuming procedural regularity and action within the agency's scope of authority).

■ There is a presumption that a statute's plain meaning expresses congressional intent. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981). The Supreme Court has "held that '[a]bsent a clearly expressed legislative intention to the contrary,' the words of the statute are conclusive." *Hallstrom v. Tillamook County,* 493 U.S. 20, 28, 110 S.Ct. 304, 310, 107 L.Ed.2d 237 (1989) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). The Court recently iterated the requirement to give application to the plain language of an unambiguous statute in *Freytag v. Commissioner,* —— U.S. ——, 111 S.Ct. 2631, 2636, 115 L.Ed.2d 764 (1991): "When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances." After finding that the statute then under review "could not be more clear" and "contains no limiting term that restricts its reach," the Court said: "We have stated that courts 'are not a liberty to create an exception where Congress has declined to do so.'" *Id.* (quoting *Hallstrom v. Tillamook County,* 493 U.S. 20, 27, 110 S.Ct. 304, 309, 107 L.Ed.2d 237 (1989)). The Federal Circuit has held: " '[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1368 (Fed.Cir.1983) (quoting *Chandler v. Roudebush,* 425 U.S. 840, 848, 96 S.Ct. 1949, 1953, 48 L.Ed.2d 416 (1976)).

■ Congress has the power to make administrative decisions unreviewable. In *Gross v. United States,* 205 Ct.Cl. 605, 615–18, 505 F.2d 1271, 1277–79 (1974), the Court of Claims, in interpreting § 1385, quoting with approval from district court cases, stated: " ' "Congress, if it so chooses, may make the administrative rejection of a claim final and conclusive.... If an agency determination is made final and conclusive by Congress, as it was here, the district court is without jurisdiction to review such action." ' " 205 Ct.Cl. at 616, 505 F.2d at 1278 (quoting *United States v. Gomes,* 323 F.Supp. 1319, 1320 (E.D.Cal. 1971) (quoting *Gregory v. Freeman,* 261 F.Supp. 362, 365 (N.D.N.Y.1966))). The Court of Claims further stated: " 'It is the court's conclusion that the weight of authority [interpreting § 1385 and similar statutes] requires the view that the official determinations of program administrators are final and conclusive, and not reviewable by the court.' " 205 Ct.Cl. at 617, 505 F.2d at 1278 (quoting *United States v. Gomes,* 323 F.Supp. at 1321).

Although §§ 1385 and 1429 both contain the phrase "final and conclusive," both were enacted prior to 1950 as part of agricultural legislation,[19] and both apply to

---

**19.** Title 7 U.S.C. § 1385 was enacted as part of    the Agricultural Adjustment Act of 1938; 7

price support programs, courts have applied § 1385 in accord with its literal terms yet have created an exception to the finality language of § 1429. This is illustrated by a pair of Court of Claims cases which constitute binding precedent here. *See Carruth v. United States*, 224 Ct.Cl. 422, 627 F.2d 1068 (1980); *Gross v. United States*, 205 Ct.Cl. 605, 505 F.2d 1271 (1974).

■ Taken literally, § 1385 would appear to preclude *all* review of any kind pertaining to factual findings, no matter how arbitrary, capricious, irrational or unsupported by substantial evidence a particular finding may be.[20] Controlling cases interpreting this section have applied its literal terms. In *Gross v. United States*, 205 Ct.Cl. 605, 615–18, 505 F.2d 1271, 1277–79 (1974), the Court of Claims, having phrased the issue as whether "the factual determinations made by the agency are final under 7 U.S.C. § 1385 and are not subject to judicial review," 205 Ct.Cl. at 615, 505 F.2d at 1277, stated without qualification: "It is concluded that the factual determinations made by the agency in this case are entitled to finality under 7 U.S.C. § 1385 and are not subject to review by this court...."[21] The court noted: "While this appears to be a question of first impression in this court, the decisions of other courts support this proposition." *Id.* at 615, 505 F.2d at 1277.

The Federal Circuit, in *Frank's Livestock & Poultry Farm, Inc. v. United States*, 905 F.2d 1515, 1517 (Fed.Cir.1990), in addressing a producer's challenge to a factual finding insulated by § 1385, declared that the administrator's factual findings "are unreviewable in this court." *Accord United States v. Batson*, 782 F.2d 1307, 1310 (5th Cir.1986) ("As [farmers] do not contend that the ASCS violated its own regulations, [§ 1385] precludes this court from reviewing the ASCS's findings of fact."), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986).

In sum, both the literal language of § 1385 and the consistent case authority constituting binding precedent for the Claims Court require a holding that factual findings of DASCO are simply unreviewable under any standard, however narrow, or for any reason, however compelling, "when officially determined in conformity with the applicable regulations."

■ On its face, § 1429 is equally unequivocal with respect to administrative "determinations." If § 1429 were applied in accordance with its plain meaning ("[d]eterminations ... by the Secretary ... shall be final and conclusive"), courts would have no jurisdiction over agency decisions concerning DTP contracts and a complaint challenging such agency action would be subject to dismissal for that reason (assuming, as is plainly the situation in the instant case, that the scope and nature of the challenged ASCS determinations are not inconsistent with the CCC Charter Act).[22] How-

U.S.C. § 1429 was enacted as part of the Agricultural Act of 1949.

**20.** For example, DASCO made a finding that "all checks written for or against the Double V dairy account have been written by [Frank Simons]" (R. 16). Yet the record contains a photocopy of a Double V check signed by Veronica (Simons) Gomes, one of the owners (R. 34).

**21.** The complete passage from which this quotation was taken is as follows:

It is concluded that the factual determinations made by the agency in this case are entitled to finality under 7 U.S.C. § 1385 and are not subject to review by this court; and the decisions of the agency based on such factual determinations are also entitled to finality and are not subject to judicial review, except as to questions of law, or allegations and proof by the plaintiff that such decisions

were arbitrary or capricious. The burden of proof is on the plaintiff to allege and prove that the decisions were arbitrary or capricious.
*Gross v. United States*, 205 Ct.Cl. at 618, 505 F.2d at 1279.

**22.** Section 1385, making agency factual findings unreviewable, was adopted in 1938 (Agricultural Adjustment Act of 1938, § 385). The Administrative Procedure Act, setting forth standards for review of agency action, 5 U.S.C. § 706, unless "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), was enacted in 1946. Section 1429 was adopted in 1949 (Agricultural Act of 1949, § 412). Thus, a literal application of § 1429's apparent prohibition of judicial review ("[d]eterminations made by the [price-support agency] shall be final and conclusive" would seem appropriate: "Nor is this one of the '"rare cases [in which] the literal application of a

ever, § 1429 has been construed contrary to its literal meaning in a case which constitutes controlling authority.

The Court of Claims, in *Carruth v. United States*, 224 Ct.Cl. 422, 436–37, 627 F.2d 1068, 1076 (1980), while acknowledging that court review of USDA action to which § 1429 applies "is very limited" and that courts "do not sit to consider the wisdom of ... [USDA] decisions," nonetheless construed § 1429 as permitting review of an administrator's decisions *"to determine that he has acted rationally* and within his statutory authority." *Id.* at 437, 627 F.2d at 1076 (emphasis added). This interpretation of § 1429 has been followed by the Federal Circuit. *Frank's Livestock*, 905 F.2d at 1517.

Presumably, the judicial review permitted by *Carruth* (to determine *rationality* of agency action) is the same as judicial review under the APA standard of 5 U.S.C. § 706(2)(A) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). *See Gross*, 205 Ct. Cl. at 618, 505 F.2d at 1279 (*"decisions* of the agency based on ... factual determinations [shielded from review by 7 U.S.C. § 1385] are also entitled to finality and are not subject to judicial review, *except as to questions of law*, or ... [unless it is shown] that such decisions were *arbitrary or capricious*" [emphasis added]).[23] *See*

*Black's Law Dictionary* (5th ed. 1979) at 96 (defining "arbitrary" as "nonrational; not done or acting according to reason or judgment"); *Webster's New Collegiate Dictionary* (1973) at 58 (defining "arbitrary" as "without reason").

In the application of these principles, questions remain concerning whether the rationality determination permitted by *Carruth* is made by comparing an administrative decision with the unreviewable factual findings (7 U.S.C. § 1385) or with the record as a whole (5 U.S.C. § 706, last ¶). No binding precedent of which we are aware squarely addresses this issue. Because the usual decision-making process proceeds from making findings of fact based on a consideration of all relevant evidence to then making legal determinations and an ultimate decision based on the facts found, and further because any other construction would have the effect of reading §§ 1385 and 1429 out of the United States Code,[24] we conclude that the rationality review permitted despite § 1429 is lawfully limited to a comparison of an administrator's decision with the facts found by him.

Support for this construction is found in *Gross*, 205 Ct.Cl. at 618, 505 F.2d at 1279 ("factual determinations made by the agency ... are entitled to finality ... and the *decisions* of the agency *based on such*

statute will produce a result demonstrably at odds with the intentions of its drafters."' " *Hallstrom v. Tillamook County*, 493 U.S. 20, 28–29, 110 S.Ct. 304, 309–10, 107 L.Ed.2d 237 (1989) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982))).

23. Arguably, the *Carruth* construction of § 1429 permitting review of agency action to determine rationality is inconsistent with the plain meaning of the statute and has the effect of reading 7 U.S.C. § 1429 out of the United States Code. The virtually identical APA standard in 5 U.S.C. § 706(2)(A), adopted in 1946, would have controlled in the absence of the later-enacted restriction of § 1429 directing that agency determinations described therein are "final and conclusive." Thus, the review standard of § 706(2)(A) controls even though the APA, in 5 U.S.C. § 701(a), directs that § 706 shall not apply when "statutes preclude judicial review."

24. An example is a situation in which factual findings are "unsupported by substantial evidence" (5 U.S.C. § 706(2)(E)), but, accepting such findings as final and unreviewable, the ultimate determination based on such findings cannot be said to be irrational. If a reviewing court were empowered to compare the ultimate decision with the "whole record or those parts of it cited by a party" (5 U.S.C. § 706, last ¶), it would vacate the decision as arbitrary, whereas, if the court's review was limited to a comparison of the ultimate determination with unreviewable factual findings, the court would be compelled to affirm.

The point illustrated is potentially pivotal in this case since all of the *direct* evidence in the record (i.e., from witnesses with knowledge) leads to the conclusions that Vincent Simons owned his own herd and that Double V was a separate non-dairy business entity in which Frank Simons had no ownership interest.

*factual determinations* are also entitled to finality [unless unlawful, arbitrary or capricious] [emphasis added]"); *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (noting need for rational connection between facts found and choice made); *United States v. Batson,* 782 F.2d 1307, 1311–12 (5th Cir.1986) ("[A] reviewing court ... [is] in a position analogous to that of a court confronting a properly presented motion for summary judgment where the facts—determined by administrators in this case—are not in dispute. Only the legal questions remain for review."), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986).

Plaintiff asserts that DASCO's finding of fact may be reviewed for arbitrariness despite the apparent prohibition of § 1385. Transcript of 6/19/91 argument at 4–5. Plaintiff relies for this proposition upon *Stegall v. United States,* 19 Cl.Ct. 765, 770 (1990) and *Raines v. United States,* 12 Cl.Ct. 530, 536 (1987). Suffice it to say that even if these cases supported the proposition that judicial review of DASCO findings of fact is available despite § 1385, their authority would yield to that of the Court of Claims and Federal Circuit which have squarely held the contrary.

D. APPLICABLE SCOPE OF REVIEW

Based on the foregoing portions of Part II B and C, we conclude that the breadth of review generally available under the Administrative Procedure Act, 5 U.S.C. § 706, is not available with respect to the DASCO decision involved here. Rather, the scope of our review is limited to resolving whether DASCO acted rationally (*see* 5 U.S.C. § 706(2)(A)), within his statutory authority and according to procedure required by law. Further, our test for rationality must be conducted by comparing DASCO's legal conclusions and ultimate determination with the facts found by him rather than with the entire evidentiary record.

III

This case currently stands on defendant's motion for summary judgment. Or- dinarily, summary judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Although plaintiff claims that there are genuine issues of material fact which preclude summary judgment, even if this were true, a case involving the Dairy Termination Program could not proceed to a *de novo* trial in this court absent extraordinary circumstances which are not present here. Regardless whether the parties agree on the facts at this stage in the proceedings, the court's review is limited to evidence and decisions contained in the administrative record. Thus, summary judgment is appropriate in a case such as this if the moving party is entitled to judgment as a matter of law upon review of the legal conclusions and factual findings reached by DASCO. *See* RUSCC 56.1.

A. SUMMARY OF VIOLATIONS

DASCO determined that plaintiff committed three violations of his DTP contract, the statute, and the regulations: (1) failure to brand dairy cattle by the branding deadline, (2) false statement of dairy herd composition on the bid date, and (3) violation of the non-production period (R. 15). Plaintiff concedes the violation of the branding deadline but contests the number of cattle for which it is imposed. Plaintiff contests the other two violations arguing that it was arbitrary, irrational and an abuse of discretion for DASCO to conclude that plaintiff had made false statements regarding dairy herd composition on the bid date or had violated the non-production period. Defendant argues that DASCO's decision has a clear rational basis and should be upheld because plaintiff failed to comply with all the contract terms and regulations of the DTP.

B. FAILURE TO MEET BRANDING DEADLINE

For the first violation identified by DASCO, failure to brand all dairy cattle by the branding deadline, DASCO imposed a pen-

alty of $100 per head on 142 head of cattle for a total branding penalty of $14,200. DASCO calculated the number of unbranded cattle from the results of a spot check by adding all unbranded cattle on plaintiff's pasture (79) with the unbranded cattle on George Joslin's (6) and Jack Hayes' (57) property. Plaintiff contends that only 37 cows and 9 calves were unbranded when the deadline expired on May 6, 1986. He also contends that the branding was completed by May 9, 1986 and thus any violation of the deadline was *de minimis.*

■ DASCO was plainly correct to the extent of finding that plaintiff failed to brand 85 cattle from his own herd (the sum of 79 from his own pasture plus six from his own herd kept on George Joslin's pasture) by the May 6, 1986 extended deadline. Plaintiff does not contest the appropriateness of a $100–per–head penalty for branding deadline violations. Plaintiff's *"de minimis"* argument is unpersuasive; the deadline was reasonable, the requirement was clear, plaintiff knew of the requirement and the deadline yet simply chose not to render timely compliance. Therefore, to the extent that DASCO's October 2, 1989 decision upholds branding penalties of $8,500, it is rational and should be affirmed, and to this extent defendant's motion for summary judgment should be granted.

## C. OTHER VIOLATIONS

■ DASCO's decision that there were branding violations with respect to an additional 57 cattle (the heifers found on Jack Hayes' property) and one of the remaining two violations found by him (false statement of dairy herd composition) both relate to ownership of the same 57 heifers.

DASCO apparently assumed, though he did not clearly so find, that the 57 heifers found on Jack Hayes' property were actually owned by plaintiff. If this assumption were correct, then DASCO's decision concerning the non-branding of the remaining heifers and concerning the herd count would be most rational—indeed compelled—and would be affirmed. If plaintiff owned these heifers, then his failure to brand them would have violated the branding requirement and his failure to report them as part of his herd would have constituted a false statement of dairy herd composition in his bid.

On the other hand, if it is found, consistent with plaintiff's contention and abundant proof, that the 57 heifers found on Jack Hayes' pasture were owned by plaintiff's adult son Vincent Simons, were maintained by Vincent on a separate pasture rented by him and were not on plaintiff's farm (or other rented pasture used by plaintiff as part of his dairy unit) at any time on or after January 1, 1986, then it would follow that the decision of DASCO concerning the remaining branding violation and the bid-count violation was arbitrary. (It is asserted by plaintiff that upon the death intestate of Vincent in February 1986, the plaintiffs (his parents) disclaimed any right of inheritance with respect to the 57 heifers, and legal title to them passed to Vincent's two adult sisters, Veronica and Vivian, who used the 57 heifers as the nucleus of their own cattle operation.)

The final violation found by DASCO was a violation of the nonproduction period, i.e., engaging in the dairy business within five years of the time for disposition of plaintiff's dairy herd pursuant to his DTP contract. DASCO apparently assumed, although he did not clearly so find, that the "Double V" cattle operation was a dairy farm and that plaintiff was a principal in the operation. Stated another way, DASCO apparently assumed that plaintiff was, after the disposal period, a "producer," that is, one who "(1) Is involved in, contributes to, or has any interest, including any ownership or financial interest, in any unit that is *used for the production milk, and* (2) Shares in the risk and/or proceeds *of the production of milk* from such unit." 7 C.F.R. § 1430.452(gg).

The record reflects that the Double V cattle operation of Veronica and Vivian Simons was formed at the suggestion of plaintiff, that the nucleus of the operation was the 57 heifers which plaintiff asserts were owned by his adult son, that plaintiff contributed capital to his daughters as a

gift, that plaintiff donated cattle feed left over upon disposition of his own herd and that plaintiff contributed cattle-buying services to the Double V operation. However, none of these factors would cause plaintiff to be in violation of the nonproduction period unless it is further found that the Double V was a dairy and that plaintiff shared "in the risk and/or proceeds of the production of milk." Plaintiff submitted evidence that the Double V cattle operation was purely a short-term stocker operation, rather than a dairy, and submitted abundant evidence that he had no ownership interest and thus did not share in the risk or proceeds of the operation whether or not it was a dairy. All persons with direct knowledge confirm plaintiff's assertions concerning the Double V operation.

Our review of DASCO's decision is severely hampered by the lack of clear and concise factual findings and subsidiary determinations. We conclude this lack is in violation of 7 C.F.R. § 780.8(d) ("The reviewing authority shall have prepared a written record *containing a clear, concise statement of the ... material facts found by the reviewing authority*") and of 7 C.F.R. § 780.9(a) ("The ... participant shall be notified in writing of the determination. The *notification [of decision] shall clearly set forth the basis for the determination*."). (Emphasis added.) [25]

When a participant's fortune and his reputation for honesty in business dealings are at stake as they are in this case, when the participant has further furnished abundant proof that he has not committed violations designated by DASCO as the basis for denial of contract payments and the imposition of penalties and, further, when DASCO's clear findings of fact are shielded

from all judicial review as they are in DTP matters, it is especially appropriate that DASCO be called upon to be quite plain in setting forth the factual basis for adverse determinations.

We conclude that the most appropriate and fair course of action will be to be remand the matter to DASCO for a "clear, concise statement of the ... material facts" concerning ownership of the 57 heifers found on Jack Hayes' property and concerning the nature and ownership of Double V cattle operation and for a clear statement of the "basis for the determination" if DASCO concludes from such facts that plaintiff was the owner of the 57 heifers at issue, that the "Double V" was a dairy and/or that plaintiff was a "producer" within the meaning of 7 C.F.R. § 1430.-452(gg).[26]

## IV

### A. ORDER OF REMAND

Title 28 U.S.C. § 1491(a)(2) provides in part: "In any case within its jurisdiction, the [United States Claims Court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." RUSCC 60.1(a) provides in pertinent part:

(1) *Issuance of Remand Order.* At the request of a party or on its own motion, the court may in any case within its jurisdiction by order remand appropriate matters to any administrative or executive body or official with such direction as may be deemed proper and just.

---

**25.** An agency is legally bound to follow its own regulations and commits procedural error if it fails to abide by them. *Service v. Dulles*, 354 U.S. 363, 379–80, 77 S.Ct. 1152, 1160–61, 1 L.Ed.2d 1403 (1957); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989) (affirming district court's finding that a determination by DASCO was procedurally defective under 7 C.F.R. Part 780).

**26.** Such a course of action is especially appropriate in this case because it is clear from the record that DASCO, upon review of the OIG

report, virtually dictated the position the county and state ASCS committees took and this occurred before plaintiff had been charged or had presented the first piece of evidence beyond responding to questions of ASCS personnel (R. 216). Plainly DASCO relied on the OIG report which is contradicted by all of the direct evidence from people with knowledge. In any fair process of decision-making, it is axiomatic that the decision-maker is obligated to consider and resolve all versions of disputed facts before making a finding.

(2) *Content of Remand Order.* An order of remand shall (A) delineate the area of further consideration or action deemed warranted on the remand, and (B) fix the extent to which, and the duration of the period, not to exceed 6 months, during which court proceedings shall be stayed.

. . . .

(5) *Advice of Administrative Action.* In every case in which an order of remand is entered pursuant to this rule, the attorney of record for the party so designated in the order of remand shall report to the court the status of proceedings on remand at intervals of 90 days or less, beginning with the date of the order.

Based on the foregoing opinion and in accord with the provisions just quoted, this matter is hereby REMANDED to DASCO for further proceedings consistent with the foregoing opinion. Any further proceedings shall be conducted in accordance with the DTP statute, 7 U.S.C. § 1446(d), and regulations, 7 C.F.R. §§ 1430.450–.470, and in accord with the ASCS Appeal Regulations, 7 C.F.R. Part 780.

In such further proceedings, DASCO shall comply with the requirements of 7 C.F.R. § 780.8(d) ("The reviewing authority shall have prepared a written record containing a clear, concise statement of the . . . material facts found by the reviewing authority") and of 7 C.F.R. § 780.9(a) ("The . . . participant shall be notified in writing of the determination. The notification [of decision] shall clearly set forth the basis for the determination."). Specific findings of fact should be made concerning the basis upon which DASCO concludes (1) that the 57 heifers found on the Jack Hayes' pasture were owned by plaintiff and (2) that plaintiff "violated the nonproduction period" (R. 15). It will be especially helpful to the court if DASCO will make reference to the portions of the record on which factual findings and determinations are based.

It is recommended that consideration be given to the applicability of 7 C.F.R. § 791.2, especially in light of DASCO's existing determination that plaintiff "has provided substantial compliance" (R. 16).

Not later than six months from the date of this opinion and order, DASCO shall file a report with the Clerk setting forth new findings of fact and determination(s) made pursuant to 7 C.F.R. Part 780, together with any other information deemed relevant by DASCO. The filing shall conform to RUSCC 60.1(b)(3).

The Clerk shall accomplish the action required by RUSCC 60.1(a)(3) & (4) (service of order and transmittal of administrative record).

Pursuant to RUSCC 60.1(a)(5), defendant is designated as the party to submit periodic status reports while this matter is on remand.

## B.  DISPOSITION OF SUMMARY JUDGMENT MOTION

Defendant's motion for summary judgment filed on August 31, 1989 is GRANTED–IN–PART (i.e., to the extent that defendant's counterclaim filed September 23, 1988 seeks a judgment for branding penalties of $8,500). In all other respects, ruling on defendant's motion for summary judgment shall be withheld and proceedings thereon suspended until completion of proceedings on remand.

Entry of judgment in favor of defendant pursuant to the partial grant of its summary-judgment motion shall be withheld pending resolution of all other issues in the case. Further, prior to entry of judgment, we must resolve whether it is appropriate to enter judgment against plaintiff Frank Simons only or against both Frank and Connie Simons. *See* n. 3 *supra.*

## C.  SUSPENSION OF COURT PROCEEDINGS

This case is hereby SUSPENDED until completion of proceedings on remand and subsequent report to the court.