**WARDLAW FARMS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 92–726C.

United States Court of Federal Claims.

Dec. 23, 1994.

---

David J. Taylor, Washington, DC, for plaintiff.

Luis M. Matos, Civ. Div., U.S. Dept. of Justice, Washington, DC, with whom were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Anthony H. Anikeeff, Asst. Director, and Terry Jackson, U.S. Dept. of Agriculture, of counsel, for defendant.

## OPINION

MARGOLIS, Judge.

This case is before the court on the plaintiff's motion for summary judgment and the defendant's cross-motion for summary judgment. Plaintiff, Wardlaw Farms, Inc. (Wardlaw), entered into a contract, to slaughter or export all of the dairy cattle on its farm, with the United States pursuant to the Dairy Termination Program, *see* 7 U.S.C. § 1446(d)(3); 7 C.F.R. §§ 1430.450–70. Plaintiff claims that it complied with its contract and the underlying regulatory scheme, and therefore it is entitled to contract payments of $129,304.80. The crux of this case is whether plaintiff was required to dispose of 41 heifers that it did not report in its bid and that were on plaintiff's farm as of the bid date. Plaintiff appeals from an adverse, final agency decision issued by the Deputy Administrator for State and County Operations (DASCO) of the Agricultural Stabilization and Conservation Service (ASCS). DASCO determined that Wardlaw was not entitled to Dairy Termination Program contract payments because Wardlaw owned 41 unreported heifers that Wardlaw did not properly dispose of and, alternatively, Wardlaw was required to dispose of the heifers regardless of ownership. Plaintiff asserts that DASCO's decision is irrational. Defendant argues that the decision should be affirmed. After careful review of the record, and after oral argument, this court grants the defendant's motion for summary judgment and denies the plaintiff's motion for summary judgment.

### FACTS

Congress enacted the Dairy Termination Program (DTP or program) to rectify a dairy surplus existing in the mid–1980s. The program ran for an eighteen month period beginning on April 1, 1986. The program operated through the use of Commodity Credit Corporation (CCC) funds, and was managed by the ASCS. Three levels of authority exist within the ASCS. On the local and state levels, programs are administered by county and state ASCS committees. 7 C.F.R. § 713.2. DASCO supervises the county and state offices from Washington, D.C. Here,

DASCO also served as the final level of review under the DTP's administrative appeal process. *See* 7 C.F.R. § 780.5 (1987).

Essentially, the DTP aimed at reducing milk production by providing monetary payments to farmers, called "producers," who slaughtered or exported the dairy cattle on their "units," a defined term that roughly equates to a dairy farm. The DTP contract's terms were provided in the appendix to form CCC–312, Record (R.) at 201, which was issued to Wardlaw by letter on February 19, 1986. The contract outlined three principal requirements for producers: (1) all dairy cattle on the unit had to be slaughtered or exported by the end of the accepted disposal period; (2) the producer could hold no interest in dairy cattle or milk production for five years after the disposal date; and (3) the milk production facilities covered by the contract also had to remain inactive for five years. CCC–312 (appendix) ¶ 6. On March 7, 1986, Plaintiff submitted a bid, form CCC–312, to participate in the DTP. The bid was irrevocable. Wardlaw was issued written notice of acceptance on March 31, 1986, which stated that its bid had been accepted for the disposal of the dairy herd between the period of April 1, 1986 through September 30, 1986.

In order to establish its milk marketing history for contract purposes, Wardlaw certified, on Form ASCS–304 dated February 26, 1986, that as of January 1, 1985 the dairy herd composition on its "unit" consisted of 252 cows, 139 heifers, and 75 calves. Wardlaw also certified that as of January 1, 1986 the dairy cattle on its unit consisted of 265 cows, 88 heifers, and 72 calves. On the bid sheet submitted on March 7, 1986, Wardlaw reported that the dairy herd consisted of 262 cows, 88 heifers, and 72 calves.

In the DTP, milk marketing history was used to create a preliminary milk base. Bids were cast in dollar amounts per hundredweight of milk base. The contract specified that the preliminary milk base would be reduced by 20,000 pounds for each head of dairy cattle transferred off of a producer's unit between January 1, 1986 and the bid date, unless the transferred cattle were slaughtered or exported. CCC–312 (appendix) ¶ 4C.

Prior to submitting its bid, Wardlaw encountered problems with a loan held by the First Bank of Southwest Mississippi (Bank). On April 20, 1985, Wardlaw renewed a maturing bank loan that was secured by 41 head of Holstein heifers. The renewed loan matured on October 17, 1985. At this time, the bank requested that Wardlaw's stockholders personally guarantee the loan. The stockholders refused. On December 20, 1985, the bank "called" the loan. By letter dated December 20, 1985, the bank stated that it required payment in full plus interest by December 30, 1985. On December 23, 1985, John Wardlaw (the President of Wardlaw Farms, Inc.) wrote that he could not raise the money without sacrificing the farm's operations. The letter stated that, "I hereby convey the 41 head of Holstein heifers used to secure the said loan to First Bank of Southwest Mississippi, as is required under the terms and conditions of the note." R. at 136. The letter further stated that: "As was previously discussed, I agree to assemble the 41 heifers at my farm, and you may take immediate possession of them without legal process." *Id.* The Bank, however, did not immediately take the heifers. There appears to have been some dispute over whether the Bank was entitled to some cows rather than all heifers, the distinction being that the former has calved. The Bank filed a replevin action in state court, and it was awarded 41 dairy heifers by an agreed judgment dated March 24, 1986. The 41 heifers awarded to the bank were selected by a third party and were transported from Wardlaw's farm on April 8, 1986. Prior to selection, Wardlaw did not specifically identify any 41 heifers as belonging to the Bank. The heifers at issue were sold at a public livestock auction on April 23, 1986 to local dairy farmers for use in future milk production.

Wardlaw did not include the 41 heifers in its herd count for January 1, 1986 and the bid date. The Pike County ASCS office later learned from the Bank that 41 heifers were not reported. Upon consultation, DASCO informed the county office, by letter dated May 23, 1986, that Wardlaw could receive DTP payments if the county determined that the reporting violation was in good faith and

Wardlaw could recover and dispose of the heifers. Wardlaw met with the county committee on June 12, 1986, and the committee's minutes show that they believed that Wardlaw proceeded in good faith and in a logical manner. However, Wardlaw told the committee that recovery of the heifers would be impossible. By letter dated July 18, 1986, DASCO advised the State office that it maintained its earlier position that Wardlaw was ineligible for payments. DASCO stated that it "realized" that "the bank had foreclosed on the producer in December of 1985." R. at 220. However, it concluded that the regulations and appendix are "very clear that all dairy cattle on the unit [as of the reporting dates] were to be reported" and that reporting is not conditioned upon ownership. *Id.* Wardlaw requested reconsideration of this determination; DASCO, after a telephonic conference, denied this request on October 21, 1986. Aside from a cursory denial letter, DASCO did not issue a written decision containing findings of fact or analysis. The county committee, on December 10, 1986, assessed a penalty of $208,440 for the violation of the reporting requirements.

Wardlaw filed a complaint in this court on October 16, 1992. The case was remanded to DASCO so that DASCO could issue a written decision, containing findings of fact and meaningful analysis, upon which the court could base judicial review consistent with the governing statutory scheme. On remand, DASCO found that Wardlaw held title as of the bid date on 41 unreported heifers that were not sold for slaughter or export. DASCO held, in the alternative, that ownership of the heifers was not a prerequisite to Wardlaw's disposal duty. Although DASCO refused to grant Wardlaw the DTP payments at issue here, it waived the reporting penalty of $208,440.

## DISCUSSION

The issue presented here is whether DASCO rationally determined that plaintiff was not entitled to contract payments because it breached the contract's disposal requirement.

### The Scope and Standard of Review

█ Judicial review of DASCO's decision in this case is limited. This court examines DASCO's determinations under the DTP program as the review of final agency action rather than "de novo" review of a breach of contract claim. *See Simons v. United States,* 25 Cl.Ct. 685, 687 (1992), *aff'd,* 17 F.3d 1444 (Fed.Cir.1994) (table); *Doty v. United States,* 24 Cl.Ct. 615, 624–26 (1991); *see also, Ryder Farms, Inc. v. United States,* 24 Cl.Ct. 278, 282 (1991). This restricted review is largely the function of statute; 7 U.S.C. § 1385,[1] places DASCO's factual findings beyond review. *See Simons,* 25 Cl.Ct. at 697 (*citing Gross v. United States,* 505 F.2d 1271, 205 Ct.Cl. 605, 615–18 (1974)). Another applicable statute, 7 U.S.C. § 1429,[2] permits review of the agency's decision to determine if the administrative official "acted rationally and within his statutory authority." *Carruth v. United States,* 224 Ct.Cl. 422, 436–37, 627 F.2d 1068, 1076 (1980); *Simons,* 25 Cl.Ct. at 698; *see also, Frank's Livestock and Poultry Farm, Inc. v. United States,* 905 F.2d 1515, 1517 (Fed.Cir.1990). Thus, the rationality test is conducted by comparing DASCO's conclusions with the administrative record and its findings of fact, which are taken at face. *See Knaub v. United States,* 22 Cl.Ct. 268, 275 (1991); *Raines v. United States,* 12 Cl.Ct. 530, 536 (1987).

### The Rationality of DASCO's Decision

█ Plaintiff entered into a contract to participate in the DTP. The contract defined the term "unit" to mean "the dairy cattle, milk production facilities, and land used together to produce milk." CCC–312 (appendix) ¶1KK. The contract specified that each producer must file a report "show-

---

1. Section 1385 provides that

   [t]he facts constituting the basis [for payment under a price support operation] when officially determined in conformity with the applicable regulations ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.

2. Section 1429 provides that

   [d]eterminations made by the Secretary under [the Agricultural Act of 1949] shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act....

ing for all units with respect to which such producer ... had an interest in dairy cattle or in the production of milk" the number of cows, heifers, and calves "on each such unit" on January 1, 1985, January 1, 1986, and the bid date. *Id.* at ¶ 2G. Regarding the disposal requirements, the contract provided that:

> All dairy cattle which as of the bid date were located on any unit with respect to which a participating producer ... was a producer on or after January 1, 1986, shall be sold for slaughter or export.... In addition, all dairy cattle in which any such producer ... had an interest on or after the bid date shall be so sold by the end of the disposal period.

*Id.* at ¶ 6A. Payment was conditioned upon the satisfaction of the contract's conditions and requirements. *Id.* at ¶ 8A. In addition, if the CCC determined that a producer "erroneously represented any fact" the producer would be ineligible for payment. *Id.* at ¶ 10A. Producers were also subject to penalties for program violations, such as making a false statement regarding herd composition. *Id.* at ¶ 9.

In essence, plaintiff argues that it did not possess an ownership interest in the 41 heifers as of the critical dates, and therefore the heifers cannot be considered part of its "unit." Because the heifers were not part of the unit, Wardlaw argues, they were not subject to the disposal requirements, and no contract violation occurred. This contention is flawed. DASCO explicitly found that Wardlaw's December 23, 1985 letter constituted only an offer to convey 41 heifers. DASCO also noted that Wardlaw failed to identify or tag 41 heifers as belonging to the Bank. R. at 040. Therefore, DASCO found that "title was with Appellant at all times through the bid date ..." R. at 042. Even assuming that DASCO's findings that the December 23, 1985 letter contained an offer and that title remained with Wardlaw through the bid date are not unreviewable factual findings, these conclusions are rational and reasonable as shown by a number of facts in the record. First, although Wardlaw's letter of December 23, 1985 hints that there may have been an agreement between the Bank and Wardlaw that gave Wardlaw the option to convey the heifers in immediate satisfaction of the debt, the security agreement does not provide Wardlaw with such an option. In addition, the Bank's letter of December 20, 1985 contains no suggestion that Wardlaw had the right to convey the heifers by mere proclamation. Second, Wardlaw failed to introduce into the administrative record persuasive evidence that the Bank did not possess the option to take title to the heifers through judicial process upon default. In addition, the hearing examiner clearly inquired into the evidence regarding the passing of title. *See* R. at 100–02. The examiner noted problems with the evidence offered: "All I have is where you [Wardlaw] are offering them to the bank in lieu of an overdue note. I don't have anything that says in writing that the bank actually takes—assumes ownership or whatever until the judgment is signed." R. at 100. Wardlaw claims that the Bank did not take the heifers because the Bank wished to wait until the Spring, when cattle values usually increase. Nevertheless, this assertion does not by its own force establish that Wardlaw had effectively divested itself of all interest in the cattle, other than mere possession, before bid date. In light of all the evidence and testimony provided in the record, DASCO's determination that Wardlaw maintained an ownership interest in the heifers through the bid date of March 7, 1986 is clearly rational.

Given DASCO's valid finding concerning ownership of the heifers, its determination that Wardlaw violated the DTP contract is rational.[3] The contract specified that DTP payments shall be made "if all conditions for payment and requirements of the contract and this Appendix are satisfied." Form CCC–312 (appendix) ¶ 8A; *see also,* 7 C.F.R. § 1430.459. The program required that the producer must slaughter or export "*all* dairy cattle ... *on* any unit...." *Id.* at ¶ 6A (emphasis added); *see* 7 C.F.R. § 1430.457(a). The disposal requirement was the fundamental purpose of the contract,

---

3. The court notes that given DASCO's rational finding that title to the heifers remained with Wardlaw through the bid date, it is unnecessary to consider DASCO's determination that the disposal requirements extend to cattle in which the producer has no ownership interest.

and Wardlaw did not meet it. The heifers were not slaughtered or exported; they were sold at public auction for future milk production. Land and milk production facilities are part of a "unit," see Form CCC–312 (appendix) ¶ 1KK, and, as of the bid date, the 41 heifers were located on the farm's land and they were fed from the farm's barn.

Wardlaw also claims that its actions were taken in good faith. Under the program, DASCO *may* extend payments to producers who rely in good faith on the advice of county or state officials. *See* 7 C.F.R. § 790.2 (1986). However, DASCO, after some consideration, concluded that it was not convinced that these violations were in good faith. R. at 044–46. DASCO rationally exercised its discretion in this regard.

## CONCLUSION

DASCO's determination that the plaintiff is ineligible for DTP payments because it failed to slaughter or export 41 heifers on its farm as of the contract bid date is rationally based on the administrative record. Accordingly, the defendant's motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied. The Clerk is directed to dismiss the plaintiff's complaint. No costs.